**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **TRANSCONTINENTAL INS. CO., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:04cv1089** |
| | ) | |
| **CALIBER ONE INDEMNITY CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION**</u>

This diversity declaratory judgment case involves a coverage and duty-to-defend dispute among insurers and an insured.  More specifically, the insured, having been sued, tendered the defense to its two insurers, one of which undertook the defense under a reservation of rights, while the other denied coverage and the duty to defend.  Because the underlying case has settled, the insured and the defending insurer seek to recover defense costs and the amount of the settlement from the insurer who denied liability.  At issue on summary judgment are the interpretation and application of certain policy provisions.

**I.**[1]

Plaintiff Virginia Sprinkler Company ("Virginia Sprinkler") is a Virginia corporation that does business throughout the Commonwealth of Virginia in the field of fire suppression system installation, inspection, and repair.  In 1996, Virginia Sprinkler contracted to install a fire suppression system in a new building being constructed in Henrico County, Virginia, for Capital One Services, Inc. and its affiliates (collectively, "the Bank").  The building, later christened "the

---

[1] The facts recited here are undisputed and derived from the parties' pleadings and supporting documents.

Heather Knolls II building," was substantially complete in September 1996.  In October 1997, Virginia Sprinkler and the Bank entered into a "Contract ... for Sprinkler System Inspections" whereby Virginia Sprinkler agreed to provide certain services for the Bank at six of the Bank's Virginia locations, including the Heather Knolls II building.  The contract's "Scope of Work" section identifies the contract as one "for the inspection of ... sprinkler systems," and states that Virginia Sprinkler would be obligated "[to] provide all materials, equipment, supplies and services to perform the inspection and servicing of [the] fire suppression systems" at the specified locations.  Under the heading "Compensation and Method of Payment," the contract provides that the Bank would pay Virginia Sprinkler a "not to exceed price" of $6,460 as "full compensation for the satisfactory performance and completion of the [w]ork as described in the ... 'Scope of Work,'" but that "[t]he actual price to be charged for th[e] work [would] be determined" in accordance with an hourly pricing schedule.  In February 1999, Virginia Sprinkler and the Bank entered into a second contract adding new locations to be serviced, but otherwise containing identical provisions.

During the periods covered by the 1997 and/or 1999 contracts, standing water collected in the fire suppression system of the Heather Knolls II building.  This condition escaped detection by Virginia Sprinkler.  Significantly, because that system was a "preaction" system, designed to stay completely dry unless and until triggered by fire or smoke, the standing water corroded the system's pipes and caused small leaks to develop.  Following the discovery of the leaks in November 2000, Virginia Sprinkler and the Bank entered into a separate contract for the replacement of the leaking sections of pipe.  In keeping with Virginia Sprinkler's customary practices, Virginia Sprinkler's repair work under this contract was billed separately from its work

under the inspection contracts.  The Bank's bill for the pipe replacement was approximately $1,200.

The discovery of the leaking pipes and the modest cost of replacement was not the end of the Bank's troubles with the fire suppression system.  Subsequent investigation by the Bank revealed significant structural and design problems in both fire suppression and heating-ventilation-air conditioning ("HVAC") systems of the Heather Knolls II building.  To remedy these problems, the Bank incurred millions of dollars in engineering and constructions costs as major portions of the fire suppression system were replaced.  In the course of this effort, it was necessary to disable the automatic activation feature of the fire suppression system and, as a consequence, the Bank was also compelled to incur hundreds of thousands of dollars in contract fees with security companies for 24-hour roving patrols to protect its employees, records, and other property from fire.

In April 2001, well before its ultimate costs were known, the Bank filed a motion for judgment in Virginia state court against parties involved in the design and construction of the Heather Knolls II building, alleging various deficiencies in the fire suppression and HVAC systems.[2]  Although not initially named, Virginia Sprinkler was added as a defendant in July 2001 when the Bank filed an amended motion for judgment.  The amended motion for judgment alleged, *inter alia*, that the fire suppression system had become "prematurely corroded" as a result of the wrongful acts of Virginia Sprinkler and other defendants.  Specifically, the amended motion for judgment in the Bank lawsuit alleged the following against Virginia Sprinkler:

---

[2] *See Capital One Realty, Inc. v. CSI Eng'g, P.C.*, Law No. 01-728 (Cir. Ct. Henrico County, Va.).  This lawsuit is referred to throughout as the "the Bank lawsuit" to avoid confusion with the instant action.

(i)      [that] Virginia Sprinkler breached the Sprinkler Maintenance Contract ... (a) by failing to maintain the Preaction System in dry condition at all times; (b) by failing properly to inspect, open, and drain the system ... ; [and] (c) by failing properly to inspect the system to ensure that the system remained dry at all times; [and]

(ii)     [that] Virginia Sprinkler breached its implied warranties (i) by failing to perform its work under the Sprinkler Maintenance Contract in a good and workmanlike manner; (ii) by failing to prevent the use of defective and unsuitable materials in the inspection, testing, draining and maintenance of the system; (iii) by failing to prevent unworkmanlike construction practices; and (iv) by failing to conduct or cause others to conduct tests and inspections necessary to determine that the system was dry.

Notably, the Bank's claims against Virginia Sprinkler rested entirely on the inspection contracts; Virginia Sprinkler's installation of the fire suppression system was not placed in issue.[3]

Once it was named in the Bank lawsuit, Virginia Sprinkler reviewed its insurance to determine whether it had coverage for the lawsuit.  During the relevant period covered by the Bank lawsuit, Virginia Sprinkler was the named insured in liability insurance policies issued by three insurers: (i) plaintiff Transcontinental Insurance Co. ("Transcontinental"), a New York corporation based in Chicago; (ii) plaintiff Transportation Insurance Co. ("Transportation"), an Illinois corporation also based in Chicago; and (iii) defendant Caliber One Indemnity Co. ("Caliber One"), a Delaware corporation based in Pennsylvania.  Transcontinental and Transportation are sister companies, collectively referred to here as "CNA."  In December 2001, Virginia Sprinkler notified CNA and Caliber One that it had been named as a defendant in the

---

[3] Presumably, the Bank's failure to assert a claim against Virginia Sprinkler based on the installation of the fire suppression system — a claim it asserted against other defendants — is attributable to (i) the absence of privity of contract between the Bank and Virginia Sprinkler with respect to the installation, and (ii) the well-established rule in Virginia that a tort action does not lie "where damage is claimed because goods purchased fail to meet some standard of quality." *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55, 57 (Va. 1998).

Bank lawsuit and requested a defense and coverage.  CNA, in response, undertook Virginia Sprinkler's defense under a reservation of rights.

In March 2002, Virginia Sprinkler also tendered the defense of the amended motion for judgment to Caliber One.  Four months later, Caliber One, by letter, denied coverage, noting the operation of various coverage provisions and exclusions in Virginia Sprinkler's policies.  Under the policies in issue, Virginia Sprinkler possessed both comprehensive general liability ("CGL") coverage and professional liability coverage for the period covered by the Bank lawsuit.[4]  The Caliber One policies' CGL provisions provide that Caliber One must defend and indemnify Virginia Sprinkler against any suit seeking damages "because of 'bodily injury' or 'property damage'" unless, *inter alia*, such injuries "aris[e] out of the rendering or failure to render any 'professional services,'" which the policies define as "Fire Suppression System Repair, Installation, and Inspection."  The policies' professional liability provisions attempt to close this gap in coverage, requiring Caliber One to defend and indemnify Virginia Sprinkler against any suit seeking damages "because of any act, error, or omission in the rendering or failure to render 'professional services' ... ."  Specifically excluded from this coverage, however, are:

> B.     "[b]odily injury," "property damage," "advertising injury," or "personal injury" except arising out of a negligent act, error or omission in the rendering or failure to render "professional services";
>
> M.     [a]ny claim resulting from estimates or probable contract costs being exceeded; express warranties or guarantees; or breach of contract as respects any agreement to perform work for a specified fee; [and]

---

[4] Caliber One issued both primary and umbrella policies to Virginia Sprinkler for the relevant period.  While the parties dispute whether the umbrella policies provide professional liability coverage, this dispute is irrelevant to the summary judgment motion at bar because the umbrella policies are ineffective unless and until it is established that the primary policies apply.  Thus, only the provisions of the primary insurance policies are at issue here.

R.      [a]ny claim arising out of the ownership, rental, leasing, maintenance, operation, use or repair of any real or personal property, including damage to property owned, occupied or used by or rented or leased to an insured.

Importantly, the policies define "property damage" as "[p]hysical injury to tangible property including all resulting loss of use of that property," and "[l]oss of use of tangible property that is not physically injured."  In its denial-of-coverage letter, Caliber One disclaimed professional liability coverage on the basis of Exclusion M, and reserved its rights with respect to Exclusions B and R as well.  The Bank lawsuit thus proceeded with CNA defending Virginia Sprinkler under a reservation of rights and Caliber One denying coverage and not participating in Virginia Sprinkler's defense.

In October 2002, Liberty Property Development Corp. ("Liberty"), one of Virginia Sprinkler's co-defendants in the Bank lawsuit, cross-claimed against Virginia Sprinkler for indemnity and contribution.  As the basis for its cross-claim, Liberty alleged that it was a third-party beneficiary of Virginia Sprinkler's contract to install the fire suppression system in the Heather Knolls II building, and that Virginia Sprinkler, not Liberty, should be liable to the extent that the system was defective.  Caliber One was tendered the cross-claim in November 2002 and asked to reconsider its denial of coverage, but persisted in its refusal to participate in Virginia Sprinkler's defense.  Approximately one year later, the Bank filed a second amended motion for judgment adding a negligence count against Virginia Sprinkler in addition to its breach of contract and breach of implied warranty counts.  The negligence count was subsequently dismissed on demurrer, however, and the record does not reflect that the second amended motion for judgment was tendered to Caliber One during the pendency of the Bank's lawsuit.  Thus, neither the cross-claim nor the second amended motion for judgment caused any change to

Caliber One's position with respect to the Bank lawsuit.

The final effort to persuade Caliber One to contribute to Virginia Sprinkler's defense came in August 2004 when CNA, via facsimile, notified Caliber One that CNA was providing a defense to Virginia Sprinkler and invited Caliber One to participate in upcoming settlement negotiations with the Bank. Caliber One declined the invitation. The following month, Transcontinental brought the present diversity declaratory judgment action against Virginia Sprinkler and Caliber One,[5] seeking a declaration that it had no duty to defend or indemnify Virginia Sprinkler against the Bank lawsuit. In October 2004, CNA and Virginia Sprinkler settled the Bank lawsuit for $2.25 million, of which Virginia Sprinkler paid $750,000. Caliber One did not participate in the settlement.

This action assumed its present form in January 2005 following Transcontinental's filing of an amended complaint to reflect the settlement of the Bank lawsuit. The amended complaint adds Transportation as a plaintiff, realigns Virginia Sprinkler from defendant to plaintiff, seeks $1 million in defense costs and $2.25 million in indemnity, and states five distinct claims against Caliber One. Virginia Sprinkler asserts claims for breach of duty to defend and breach of duty to indemnify. CNA, as Virginia Sprinkler's partial subrogee, asserts the same claims. Finally, both CNA and Virginia Sprinkler jointly assert a claim of unjust enrichment. Common to all of these claims is the theory that Caliber One was contractually obligated to defend and indemnify Virginia Sprinkler against the Bank lawsuit.

---

[5] Also originally named as a defendant was Maxum Indemnity Co. Transcontinental named Maxum as a defendant on the theory that Maxum was Caliber One's successor-in-interest with respect to Virginia Sprinkler's insurance policies. Maxum subsequently demonstrated that it was not Caliber One's successor-in-interest, and thus was dismissed. *Transcontinental Ins. Co. v. Caliber One Indem. Co.*, Case No. 1:04cv1089 (E.D. Va. Nov. 22, 2004) (Order).

In February 2005, Caliber One filed the instant motion for summary judgment with respect to its duties to defend and indemnify.  Following oral argument on the motion, supplemental briefing was ordered on various questions related to the construction of Exclusions B, M, and R.  These issues having been thoroughly briefed and argued, Caliber One's summary judgment motion is now ripe for disposition.

## II.

The principles governing summary judgment are well-established.  A party's motion for summary judgment should be granted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  In determining whether to grant a party's motion, a court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The facts set forth, moreover, must be more than a mere scintilla of evidence; rather, the evidence offered must be sufficient for a reasonable factfinder to find in the non-moving party's favor.  *See id.* at 248-251.

In this case, the material facts are uncontested and the parties instead dispute only whether certain policy provisions and exclusions operate to relieve Caliber One from any duty to defend or indemnify Virginia Sprinkler.  Given this, adjudication by way of summary judgment is appropriate.

-8-

## III.

Since the crux of the parties' dispute is the interpretation and application of various policy provisions, it is appropriate to begin the analysis by setting forth the settled principles of insurance policy interpretation that must guide and govern the analysis of the questions presented. It is well-settled under Virginia law[6] that an insurer's duty to defend is broader than its duty to indemnify. *See, e.g., Morrow Corp. v. Harleysville Mut. Ins. Co.*, 110 F. Supp. 2d 441, 446 (E.D. Va. 2000); *Virginia Elec. & Power Co. v. Northbrook Property & Cas. Ins. Co.*, 475 S.E.2d 264, 265 (1996); *Lerner v. General Ins. Co.*, 245 S.E.2d 249, 251 (Va. 1978). Under Virginia law, an insurer's duty to defend is determined by a combination of the Exclusive Pleading Rule and the Potentiality Rule. *See Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 791 (E.D. Va. 2001); *Town Crier, Inc. v. Townside Partners Realtors*, 721 F. Supp. 99, 102 & n.12 (E.D. Va. 1989). Under the Exclusive Pleading Rule, an insurer's duty to defend is determined solely by the claims asserted against the insured in the underlying action. *See Solers*, 146 F. Supp. at 791. Under the Potentiality Rule, an insurer's duty to defend is triggered if there is any possibility that a judgment against the insured will be covered under the terms of the insured's policy. *See id.* Thus, to determine whether an insurer has a duty to defend an insured against a suit, a court must determine whether any of the claims asserted in the suit potentially

---

[6] Virginia substantive law governs this case. Where subject-matter jurisdiction is based on diversity of citizenship and amount in controversy, a federal district court is bound to apply the substantive law and choice of law rules of the forum state. *See Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 623-624 (4th Cir. 1999) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)). Under Virginia law, the law of the place where an insurance contract was written and delivered governs questions of insurance coverage. *See Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993). Because the insurance contracts in issue were delivered to the insured in Virginia, the parties correctly agree that Virginia law governs here.

come within the policy's scope of coverage. *See, e.g., Town Crier*, 721 F. Supp. at 102. This is accomplished by comparing (a) the policy terms defining the scope of coverage, with (b) the claims asserted against the insured as pleaded in the complaint. *See Morrow*, 110 F. Supp. 2d at 447.

When construing the policy terms, it is important to bear in mind that an insurance policy is a contract, and as such, its terms are governed by rules of contract interpretation. *See Town Crier*, 721 F. Supp. at 101. Thus, unambiguous policy terms are given their plain and ordinary meaning. *See America Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 93 (4th Cir. 2003) (Virginia law); *Salzi v. Va. Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002). On the other hand, because "the principal purpose of insurance is protection," and because insurance policies are typically drafted by insurers, any ambiguities in policy terms are "construed in favor of coverage or indemnity and against a limitation of coverage." *America Online*, 347 F.3d at 93 (quoting *United Services Auto. Assn. v. Webb*, 369 S.E.2d 196, 198 (Va. 1988)). Additionally, an insurer always bears the burden of proving that an exclusion from coverage is applicable. *See Town Crier*, 721 F. Supp. at 101. None of these rules, however, authorizes a court to rewrite an insurance policy for the parties, nor to construe a policy contrary to its plain language or the parties' intent. *See id.*

As Virginia law requires, the analysis of Caliber One's duties to defend and indemnify must begin by comparing the claims asserted against Virginia Sprinkler in the underlying action to the coverage terms of the policies in issue. In the Bank lawsuit, Virginia Sprinkler was sued under breach of contract and breach of implied warranty theories. The Bank's essential allegations were that Virginia Sprinkler failed to inspect and maintain properly the fire

suppression system of the Heather Knolls II building.[7]  Because these claims unquestionably "aris[e] out of the rendering or failure to render ... 'professional services,'" as that term is defined in Virginia Sprinkler's policies, they are plainly outside the scope of the policies' CGL provisions, which expressly exclude any such claim.  Thus, Caliber One owed no duty to indemnify Virginia Sprinkler under those provisions nor even a duty to defend it under the Potentiality Rule.  By the same token, however, the Bank's claims are plainly within the scope of the policies' professional liability provisions, which extend coverage to any suit seeking damages "because of any act, error, or omission" in the performance of fire suppression system inspections.  Under the plain terms of these latter provisions, therefore, Caliber One breached its duties to indemnify and defend Virginia Sprinkler unless an exclusion operates to bar coverage for the Bank's claims.  In this regard, Caliber One contends that the Bank's claims against Virginia Sprinkler come within the terms of Exclusions B, M, and R.  If Caliber One is correct with respect to any of these Exclusions, summary judgment in its favor is appropriate.  Accordingly, the application of each Exclusion to the instant facts merits close inspection.

1.    **Exclusion B**

Exclusion B states that no professional liability coverage is provided for "'[b]odily injury,' 'property damage' 'advertising injury,' or 'personal injury' except arising out of a negligent act, error or omission in the rendering or failure to render 'professional services ... .'"

---

[7] The parties' briefs do not address what effect, if any, Liberty's cross-claim against Virginia Sprinkler should have on Caliber One's duties to defend and indemnify.  Accordingly, the cross-claim is not discussed here.  Additionally, while Virginia Sprinkler contends that the negligence claim in the Bank's second amended motion for judgment should be considered in the claims/terms analysis, the record does not reflect that that claim was tendered to Caliber One.  It is, therefore, irrelevant.  For these reasons, only the Bank's claims in the first amended motion for judgment, *i.e.*, breach of contract and breach of implied warranty, are considered here.

Caliber One contends that Exclusion B's requirement of "a negligent act, error, or omission" operates to exclude from professional liability coverage any claim seeking recovery for one of the referenced categories of injury that is not formally pleaded in negligence.  Thus, in Caliber One's view, no professional liability coverage exists for "property damage" — even if caused by inadvertent or unintentional acts — if the claim seeking recovery for that damage is pleaded in contract.  Because the corrosion alleged in the Bank's amended motion for judgment falls within the policies' definition of "property damage," *i.e.*, "[p]hysical injury to tangible property including all resulting loss of use of that property," Caliber One contends that Exclusion B bars coverage for the Bank's breach of contract and breach of implied warranty claims, and hence that Caliber One had no duty to defend or indemnify Virginia Sprinkler in the Bank lawsuit.

While it is well-settled that "a negligent act, error, or omission" requirement in a professional liability insurance policy precludes an insurer's duties to defend and indemnify when the insured is sued for intentional torts,[8] no Virginia court has addressed whether such language has the same effect when the insured is sued in contract.  Decisions from other jurisdictions, however, consistently hold that it does not.[9]  While the reasoning underlying these decisions differs from

---

[8] *See, e.g.*, *Town Crier*, 721 F. Supp. at 103-04.

[9] *See, e.g.*, *Mgmt. Support Assocs. v. Union Indem. Ins. Co.*, 473 N.E.2d 405, 412 (Ill. App. Ct. 1984); *USM Corp. v. First State Ins. Co.*, 652 N.E.2d 613, 614-15 (Mass. 1995); *Touchette Corp. v. Merchants Mut. Ins. Co.*, 76 A.D.2d 7, 10 (N.Y. App. Div. 1980); *Cadwallader v. New Amsterdam Cas. Co.*, 152 A.2d 484, 489 (Penn. 1959); *cf. Richards v. Fireman's Fund Ins. Co.*, 417 N.W.2d 663, 667 (Minn. Ct. App. 1988) (holding that no coverage existed only because the underlying complaint alleged an intentional breach); *but see Correll v. Fireman's Fund Ins. Cos.*, 505 So. 2d 295, 296-97 (Ala. 1986).  Importantly, *Correll*'s weight as contrary authority is diminished significantly by the fact that the complaint in issue in that case alleged only intentional acts.  Thus, no case adduced by the parties holds that a breach of contract claim is *per se* excluded from professional liability coverage by "negligent act, error, or omission" policy language.

-12-

case to case, a common thread running through the better-reasoned decisions is the recognition

that an act or omission that is "negligent" — as that word is commonly used — can give rise to a

breach of a contractual duty in certain circumstances, *i.e.*, where a contract exists, just as such an

act can give rise to a tortious injury in circumstances where there is a duty but no contract.  *See*,

*e.g.*, *Touchette*, 76 A.D.2d at 10-11; *Cadwallader*, 152 A.2d at 488-89.  As one court succinctly

put it, "negligent acts, negligent errors, or negligent omissions when committed in the context of

contract performance may be contract breaches... ."[10]  Accordingly, these courts look to the

nature of the act the insured is alleged to have committed, *i.e.*, intentional or unintentional, rather

than to the form of action pleaded to determine whether coverage and/or a duty to defend exists.

*Touchette*, 76 A.D.2d at 10-11; *Mgmt. Support*, 473 N.E.2d at 411; *Richards v. Fireman's Fund

Ins. Co.*, 417 N.W.2d at 667.  Consistent with the Potentiality Rule, moreover, such courts have

held that the insurer owes a duty to defend even when the pleadings do not clearly allege an

unintentional breach; unless the pleadings leave no doubt that the breach alleged was intentional,

the insurer must defend even though the ultimate issue of coverage "will have to await the trial of

the action."  *Touchette*, 76 A.D.2d at 10; *accord Mgmt. Support*, 473 N.E.2d at 411-12.

The principle that "the nature of the insured's conduct" should trump the form of action

pleaded in the coverage and duty-to-defend analysis is supported by the commonsense

proposition that an insured purchases professional liability insurance "to protect it[self] from its

---

[10] *City of Dillingham v. CH2M Hill Northwest, Inc.*, 873 P.2d 1271, 1275 (Alaska 1994).
Although *City of Dillingham* involved a limit-of-liability clause in a construction contract rather
than an exclusion in an insurance contract, the issue in that case, as here, was whether a breach of
contract claim can involve "a negligent act, error, or omission," and thus the case is instructive.
*But see W. William Graham, Inc. v. City of Cave City*, 709 S.W.2d 94, 95-96 (Ark. 1986)
(holding breach of contract claim not within limit-of-liability clause covering "negligent acts,
errors or omissions").

own failures" and cannot readily control whether it is sued for those failures in tort or contract. *Touchette*, 76 A.D.2d at 10-11.  In the instant circumstances, this rationale applies with particular force.  Under Virginia law, no tort action lies for harm that arises, as here, solely from breach of an agreement rather than from breach of an independent legal duty.  *See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55, 58 (Va. 1998).  Given this rule, an entity like Virginia Sprinkler that furnishes professional services exclusively by contract cannot anticipate being sued in tort for on-the-job errors, even when, as here, those errors cause "property damage" to its clients.  In such circumstances, the effect of construing Exclusion B as Caliber One urges would be to eliminate the very coverage that Virginia Sprinkler sought to purchase for its $600,000 premium.  Thus, it is sensible to conclude that Virginia Sprinkler paid for professional liability coverage that would include negligent — but not intentional — acts, even if a claimant were to sue on a contract theory.

Indeed, it is difficult to discern why Virginia Sprinkler would purchase professional liability insurance that, as Caliber One contends, does not extend coverage to breach of contract claims for "property damage," when that is precisely the kind of claim anticipated in its work.  In the course of the hearing, counsel for Caliber One was asked what risks would be covered if Exclusion B were given the broad construction that Caliber One advocates.  In response, counsel stated that coverage would exist in the event a non-client of Virginia Sprinkler, *i.e.*, an entity with no contract with Virginia Sprinkler, were to make a claim for property damage caused by bursting pipes in the Bank building.  This example hardly explains why Virginia Sprinkler would pay a $600,000 premium for such a minimal or nonexistent risk.  It is hard to see what duty Virginia Sprinkler would owe to such a hypothetical non-client, and in any event it is unlikely

that injury to non-clients was the risk that Virginia Sprinkler hoped to insure itself against when it purchased professional liability coverage to cover work it performs only pursuant to contract. Given this, it is particularly appropriate here to look to the nature of Virginia Sprinkler's conduct rather than to the form of action asserted against it in the Bank lawsuit to determine whether Caliber One was obligated to defend and indemnify Virginia Sprinkler in that lawsuit. *See Touchette*, 76 A.D.2d at 10-11.

Opposing this conclusion, Caliber One contends that *Town Crier, Inc. v. Townside Partners Realtors*, 721 F. Supp. 99 (E.D. Va. 1989), establishes that only the claims asserted — not the particular acts alleged — are relevant to the issues of coverage and the duty to defend.  In that case, two insureds sued their insurer to recover defense and indemnity costs in a civil lawsuit based on (i) actual fraud; (ii) business conspiracy in violation of Va. Code §§ 18.2-499 and 18.2-500; and (iii) "unconscionable" transactions in violation of the Virginia Real Estate Cooperative Act, Va. Code §§ 55-424 to 55-506. *Id.* at 104.  As here, the insureds' professional liability insurance only covered damages arising out of "negligent act(s), error(s), or omission(s)" in the performance of professional services. *Id.* at 103.  Given these terms, the district court held that the insurer had no duty to defend the insured in the underlying lawsuit because "all claims in the state complaint seek relief only for injuries caused ... knowingly or intentionally by the Insureds ... ."[11]  In so holding, the district court rejected the insured's argument that the claims against it "include[d] the elements of unintentional torts that f[e]ll within the policy's coverage," stating, "the fact that some of the allegations in the case at bar could establish a case for negligent

---

[11] *See Town Crier*, 721 F. Supp. at 104.  With respect to the statutory claims against the insured, the district court alternatively held that such claims were excluded by the policy's exclusion for violations of state statutes. *Id.*

misrepresentation is immaterial because that claim is not made." *Id.* at 104.  Seizing on this language, Caliber One contends that Exclusion B, like the policy language in issue in *Town Crier*, requires an actual *claim* of negligence, not merely allegations that negligent conduct occurred.

Caliber One's reliance on *Town Crier*, however, is misplaced.  The issue in *Town Crier* was not whether a "negligent act, error or omission" requirement in a professional liability policy bars coverage for any claim not pleaded in negligence, and thus to the extent that the statement relied upon by Caliber One implies that it does, the statement is *dicta*, and expressly contradicted by decisions from other jurisdictions directly on point.[12]  Rather, the issue in *Town Crier* was whether a policy covering only *negligent* acts provides coverage against claims based on *intentional* acts, and the district court properly held that it did not.  *Town Crier*, 721 F. Supp. at 104.  Here, by contrast, the issue is whether policies covering only negligent acts provide coverage against claims based on inadvertent or unintentional acts that, as it happens, amount to breaches of an express contract.  *Town Crier*, therefore, is inapposite.

It is appropriate here, therefore, to scour the allegations against Virginia Sprinkler in the Bank's amended motion for judgment to determine whether therein lies "a negligent act, error, or omission" that satisfies Exclusion B and brings the Bank's breach of contract and breach of warranty claims within the scope of Virginia Sprinkler's professional liability coverage.  As previously noted, the Bank's claims against Virginia Sprinkler allege, *inter alia*, that Virginia

---

[12] *See, e.g.*, *Mgmt. Support*, 473 N.E.2d at 411 ("There is no question that the allegations of the complaint and not the theory determine whether there is a duty to defend."); *Touchette*, 76 A.D.2d at 10 ("It is not the form of the pleading which determines coverage, ... it is the nature of the insured's conduct ... .").

Sprinkler "fail[ed] properly to inspect, open, and drain the [fire suppression] system," "fail[ed] properly to inspect the system to ensure that [it] remained dry at all times," and "fail[ed] to perform its work ... in a good and workmanlike manner ... ."  Given these and other references to improper and unworkmanlike performance by Virginia Sprinkler, and the lack of any reference to intentional wrongdoing, there is no basis to conclude that Exclusion B is applicable here.  Under the reasoning set forth in *Touchette* and other cases, moreover, even if it were eventually proven at trial that Virginia Sprinkler had acted intentionally, say, by deliberately sabotaging the Bank's fire suppression system, Caliber One would nonetheless have owed Virginia Sprinkler a defense in the interim because the allegations in the Bank's claims do not allege intentional wrongdoing and thus are not clearly outside the scope of coverage.  *See Touchette*, 76 A.D.2d at 10.  Thus Exclusion B did not operate to relieve Caliber One from its duty to defend Virginia Sprinkler in the Bank lawsuit.  And it could escape a duty to indemnify Virginia Sprinkler on the basis of this exclusion only by proving in this proceeding that the damage in issue was the result of Virginia Sprinkler's intentional wrongdoing.  For these reasons, summary judgment on the basis of Exclusion B is inappropriate.

## 2.    Exclusion M

Exclusion M states that no professional liability coverage is provided for "any claim resulting from estimates or probable contract costs being exceeded; express warranties or guarantees; or breach of contract as respects any agreement to perform work for a specified fee."  As stated at the outset, the "Compensation and Method of Payment" section of the 1997 and 1999 inspection contracts provides for a "not to exceed price" of $6,460, and an hourly fee schedule to determine the actual price of services rendered.  Caliber One contends that these fee

provisions bring the 1997 and 1999 contracts within the meaning of "an[] agreement to perform

work for a specified fee," and consequently that Exclusion M bars coverage for the Bank's

breach of contract and breach of implied warranty claims.  In support of this argument, Caliber

One contends that "the fee for full performance of the contract is specified, that is, $6,400," and

that "merely because the actual price, in the event of less than full performance, must be

determined by a simple calculation according to the specified hourly rate contained in Schedule

B, does not bring this contract outside the realm of one for a specified fee."  Def.'s Reply Mem.

Summ. J. at 15.

Although the insurance policies in issue do not define "an agreement to perform work for

a specified fee," and neither party has adduced authority from Virginia or elsewhere providing

guidance as to the proper construction of this phrase, settled rules of insurance-policy

interpretation compel the conclusion that Exclusion M is inapplicable here.  Insurance policies,

like all contracts, are to be construed in accordance with their plain and ordinary meaning

whenever their terms are unambiguous.  *See America Online*, 347 F.3d at 93.  The plain and

ordinary meaning of the phrase "an[] agreement to perform work for a specified fee" is an

agreement in which the ultimate amount to be charged is fixed at the outset.  Clearly, this plain

meaning does not encompass agreements like the contracts in issue, that provide for a fee that

may not be calculated or determined until after performance has been rendered.  Even assuming,

*arguendo*, that the phrase is infected with ambiguity,[13] it is, of course, settled that the ambiguity

must be resolved in favor of coverage.  Indeed, were the phrase to be construed as Caliber One

---

[13] It is worth noting here that contractual language is not ambiguous merely because the
parties to a lawsuit disagree about its meaning.  *See Eure v. Norfolk Shipbuilding & Drydock
Corp. Inc*, 561 S.E.2d 663, 668 (Va. 2002); *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984).

argues, then any breach of contract claim arising from a fee-per-hour contract — the only type of arrangement by which Virginia Sprinkler works — would be outside the scope of Virginia Sprinkler's professional liability coverage.  In this respect, Caliber One's contention that Exclusion M voids coverage for claims arising from such contracts closely resembles its argument regarding Exclusion B, as both arguments seek to deny coverage for precisely the type of claims to which Virginia Sprinkler is most likely to be subjected as a consequence of rendering professional services.

Because the 1997 and 1999 inspection contracts in issue in the Bank lawsuit are plainly not "specified fee" contracts, it is unnecessary to determine the merits of CNA and Virginia Sprinkler's contention that Exclusion M should be construed to apply only to contractual disputes regarding the fees charged rather than the quality of services rendered.  In this regard, however, it is worth noting that while this suggested construction is not compelled by the plain language of Exclusion M, it has considerable common sense appeal in light of the Exclusion M's first clause, *i.e.*, "this insurance does not apply to ... any claim resulting from estimates or probable contract costs being exceeded."  Additionally, such a construction of Exclusion M would sensibly remove from coverage a category of dispute for which professional liability insurance seems unnecessary and inappropriate.  *Cf. Sec. Ins. Group v. Wilkinson*, 297 So. 2d 113, 115 (Fla. Dist. Ct. App. 1974) (holding that no malpractice liability coverage existed for a contract dispute between doctor and patient in which injury to the patient was not alleged); *Safian v. Aetna Life Ins. Co.*, 260 A.D. 765, 768 (N.Y. App. Div. 1940) (no malpractice coverage for doctor's breach of agreement to cure patient).  Were this construction to be applied here, Exclusion M would not bar coverage and the duty to defend against the Bank's claims since the

Bank's contract and warranty claims clearly concern more than Virginia Sprinkler's fees.  As stated, however, it is unnecessary to determine whether this is the proper construction, given that the contracts in issue are not encompassed by the plain and ordinary meaning of Exclusion M's terms.

**3.      Exclusion R**

Exclusion R states that no professional liability coverage is provided for "any claim arising out of the ownership, rental, leasing, maintenance, operation, use or repair of any real or personal property*,* including damage to property owned, occupied or used by or rented or leased to an insured."  In Caliber One's view, the Bank's claims against Virginia Sprinkler in the underlying action were claims "arising out of the ... maintenance ... or repair of ... personal property," namely Virginia Sprinkler's maintenance of the fire suppression system in the Heather Knolls II building.  Caliber One thus contends that the Bank's claims against Virginia Sprinkler fall within the plain language of Exclusion R, and therefore that it had no duty to defend or indemnify Caliber One in the Bank lawsuit.

At first blush, the most striking and salient feature of Exclusion R is that when given the liberal construction urged by Caliber One, it appears to sweep away the very professional liability coverage that Virginia Sprinkler purchased.  As noted at the outset, the Professional Services Schedule of Virginia Sprinkler's Caliber One policies identifies "Fire Suppression System Repair, Installation, and Inspection" as the specific activities to which professional liability coverage applies.  By its plain terms, Exclusion R appears to void coverage for an activity explicitly designated as covered on the Professional Services Schedule, *i.e.*, "Repair," and implicitly to void coverage for the other two designated activities as well, at least insofar as

"Installation[] and Inspection" fall within the meanings of "maintenance," "operation," and "use."  Because insurance policies, like all contracts, must be construed as a whole, and in a manner that gives effect to all policy provisions, some limiting construction of Exclusion R is necessary to avoid the result that Virginia Sprinkler in fact purchased no professional liability coverage whatsoever.  *See Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993) ("Contract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage."); *Suggs v. Life Ins. Co.*, 147 S.E.2d 707, 710 (Va. 1966) ("[A]ll of the provisions of a contract of insurance should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein.").

Recognizing that conflicting terms in a contract of insurance must be construed in favor of the insured, *see Mgmt. Support*, 473 N.E.2d at 409; *Sentry Ins. v. Hogan*, 444 N.E.2d 761, 763 (Ill. App. Ct. 1982), Caliber One concedes that Exclusion R must be construed not to exclude claims arising out of the specific activities listed in the Professional Services Schedule.  *See* Def.'s Supplemental Mem. Supp. Summ. J. at 11 ("Claims seeking damages because of any act, error, or omission in the rendering or failure to render 'professional services,' such as, for example, inspection or installation of fire suppression systems, are not excluded by Exclusion R.").  So construed, Exclusion R cannot bar coverage for the activities of inspecting, repairing, and installing sprinkler systems, and thus the questions of coverage and the duty to defend in the present case turn on whether any of these activities can be said to give rise to the Bank's claims against Virginia Sprinkler.  In this regard, it is pellucidly clear that Virginia Sprinkler was sued in

the Bank lawsuit, *inter alia*, for "failing properly to *inspect*, open, and drain the [fire suppression]

system," and "failing properly to *inspect* the system to ensure that [it] remained dry at all times"

(emphasis added).  Accordingly, even under the construction of Exclusion R suggested by

Caliber One, Exclusion R does not void professional liability coverage and the duty to defend in

the Bank lawsuit.  The fact that the Bank's claims also allege harm arising from some excluded

activities, namely maintenance, is irrelevant here; the appropriate question for purposes of

coverage and the duty to defend is whether *any*, not *all*, of the claims against an insured come

within the scope of coverage.  Thus, Exclusion R does not exclude professional liability coverage

for the Bank's claims against Virginia Sprinkler, and summary judgment on the basis of

Exclusion R is inappropriate.

## IV.

For the foregoing reasons, defendant Caliber One's motion for summary judgment must

be denied.

An appropriate Order will issue.[14]


/s/
Alexandria, Virginia                                        T. S. Ellis, III
April 28, 2005                                              United States District Judge

---

[14] It appears that the parties have resolved this matter by agreeing to two different
settlements, one of which would take effect if Caliber One's summary judgment motion is
granted on any ground, and the other of which take effect if summary judgment is denied.
Because summary judgment must be denied, this matter must remain open until the parties
submit an appropriate agreed dismissal order.